## JENNINGS v. ABBEVILLE COUNTY.

1. Under the constitution of 1868 and the laws since passed, the board of county commissioners have exclusive jurisdiction to audit and provide payment for county claims, subject to the right of appeal; and therefore no action upon such claims can be instituted against the county in the Court of Common Pleas.

2. The board of county commissioners are the one administrative body of the county, with jurisdiction local but large, having original and exclusive powers over all matters pertaining to county affairs.

3. The powers and duties of the board of county commissioners under the constitution of 1868 and the laws passed in pursuance thereof, considered and declared.

4. A county may be sued, but if upon a county claim it must be done before the board of county commissioners by filing the claim for audit; for certain causes of action *ex delicto*, the suit may be maintained in the Court of Common Pleas.

5. The board of county commissioners was created by the constitution as a new body with certain local powers and for certain special purposes, and in such case the powers given and the mode and manner of their exercise are in their nature exclusive.

Before PRESSLEY, J., Abbeville, February, 1885.

The opinion fully states the case.

*Mr. L. W. Perrin*, for appellant.

*Mr. Eugene B. Gary*, contra.

April 20, 1886. The opinion of the court was delivered by

MR. JUSTICE MCGOWAN. In 1831, the county commissioners of Abbeville let out the contract to build a wooden bridge over Little River at Searls' Mill, in said county, to Catlett Corley, William Harmon, J. T. Jennings, and J. C. Jennings as the contractors, for $556. After the contract was made, it was changed so as to require rock piers, at the additional cost of $60 per pier (being three in number). There were specifications as to the kind of rock and the manner in which the piers were to be built, requiring "good rock that will not crumble, laid solidly in good hydraulic cement, the workmanship to be very substantial and

complete," &c.   It was announced that the bridge was finished according to contract, inspected by the county commissioners, and from its external appearance accepted by them in September, 1881, and the claims of the contractors (the whole claim, it seems, was divided among them) were approved by the county commissioners November 7, 1881, and payment in part made, but checks for the balances still due on the contract were not drawn.

Within a few months, during the high waters of January and February, 1882, the bridge fell down.   The county commissioners then made a careful examination of the fallen piers, and, as they thought, discovered for the first time that they had not been built according to contract, but, on the contrary, instead of being built solid with good rock laid in cement, only the rim or outer wall was laid in cement, and the hollow filled up with loose rock from the stream; and having, as they supposed, made this discovery, refused to issue the checks for the remainder of the price agreed to be paid.   Thereupon the contractors brought this action against the County of Abbeville.   The interest of Catlett Corley had been assigned to one Henry Young, and as he would not join in the action as plaintiff, he was made a defendant.

The defendant demurred, on the grounds that the complaint did not state facts sufficient to constitute a cause of action, and that the Court of Common Pleas has not jurisdiction to hear and determine an original action upon a county claim.   The presiding judge overruled the demurrers, and sent the case to the jury. They found a verdict for the plaintiffs to the extent of the whole balance of the price agreed upon, and the defendant, County of Abbeville, appeals to this court upon the following grounds: *First.* Because his honor erred in overruling the demurrers of defendant:   1. That the complaint did not state facts sufficient to constitute a cause of action.   2. That the Court of Common Pleas did not have original jurisdiction of the subject matter of the action.   And failing in these, then for a new trial.   *   *   *

From the view the court takes of this case, it will not be necessary to consider any of the grounds of appeal, except the first, as to the demurrers.   This is the first case in which the question has been made in this court whether, under the constitution of 1868 and the laws since passed, the board of county commis-

sioners have exclusive jurisdiction to audit and provide payment for that class of demands which, being contracted by the commissioners as representing the county, are called "county claims," subject only to the right of appeal; or whether the Court of Common Pleas may take original jurisdiction of such claims and hear and determine them, rejecting or giving judgment against the county precisely as in ordinary cases. There have been cases in which the question might have been made, as, for instance, *Ostendorff* v. *Charleston County*, 14 *S. C.*, 403; *Holmes & Calder* v. *Same, Ibid.*, 146; *Edmondston* v. *Aiken County, Ibid.*, 622; *Wheeler* v. *County of Newberry*, 18 *Id.*, 135; and *Duke* v. *Williamsburg County*, 21 *Id.*, 414.

But in these cases the point was not raised, and cannot, therefore, be considered as adjudged. This court, in *Wheeler* v. *Newberry, supra,* said: "The court has never been required to consider how a creditor, having a claim already audited, should proceed to enforce it against the county—whether, considering the audit as a judgment of the tribunal established for the purpose of deciding county claims, he should seek to enforce it by mandamus, requiring the county commissioners to have the money raised to pay it, or sue upon it in the Court of Common Pleas to get thereby an enforcible judgment against the county. There is some want of uniformity in the practice of the different States upon the subject, and until the point is made and argued before us, we will make no ruling upon it." And in the subsequent case of *Duke* v. *County of Williamsburg, supra*, Mr. Justice McIver, who delivered the judgment of the court, said: "No question has been raised as to the form of proceeding in this case, and we shall not volunteer to do so. Whether a person claiming to be the creditor of a county can bring his action in the usual form for the recovery of his alleged debt, except in such cases as the right of action is given by statute, or whether he should not submit his claim for audit to the county commissioners, from whose judgment, if unfavorable to him, he may appeal, and after he has thus established his claim, whether his remedy is not by mandamus to compel the county commissioners to levy a tax to pay the same, is a question upon which we prefer to reserve our judgment," &c.

The point is now, however, formally made, and it is necessary for us to decide it.   The constitution of 1868 made a new distribution of the judicial power of the State.   Section 15, article IV., provides that "The courts of common pleas shall have   *   * exclusive original jurisdiction in all civil cases and actions *ex delicto,*   *   * and appellate jurisdiction in all cases as may be provided by law," &c.   Section 19, article IV., provides as follows: "The qualified electors of each county shall elect three persons for the term of two years, who shall constitute a board of county commissioners, which shall have jurisdiction over roads, highways, ferries, bridges, and in all matters relating to taxes, disbursements of money for county purposes, and in every other case that may be necessary to the internal improvement and local concerns of the respective counties: Provided, that in all cases there shall be the right of appeal to the State courts."

These sections stand in what is known as the judicial article, and, considered together as parts of the same instrument, seem to show two things: First, that a new body, known as the "board of county commissioners," was then created, having a local but large jurisdiction, having, indeed, entire charge of county affairs as the one administrative body of the county; not only to contract but to "audit" and provide payment for all that class of demands known as "county claims."   And second, that these powers are not only original, but in their very nature exclusive; not falling within any other jurisdiction, except as provided by appeal to the State courts.   This view is fortified by the fact that at the time the constitution was drafted, giving this right of appeal, the counties of the State were not bodies politic and corporate, and as such capable of being sued directly.

When we look to the acts of the legislature passed to carry into effect the important provision of the constitution creating the board of county commissioners, we think it appears that they were all framed on the line of making one consistent system for the management and control of county affairs, intended to be expeditious, but just, economical, convenient, and complete in itself.   See *General Statutes,* chapter XVI., as to "County Commissioners," and the act of 1882, "to define their duties," appended as a note.

1. The county commissioners are required annually to make an estimate of what the government of the county will require, and report the number, character, and amount of claims audited for the fiscal year to the comptroller general, who shall transmit the same to the governor, to be by him laid before the legislature; indicating the amount necessary for county purposes to be raised by taxation; and all claims against a county not presented during the fiscal year in which they are contracted or the next thereafter shall be forever barred.

2. It is made the duty of the county commissioners not only to make all contracts in behalf of the county, but to "audit" (or disallow) all county claims, and provide for those approved by giving checks upon the county treasurer. They are allowed to give checks only for legal claims audited by themselves, with the single exception of a judgment recovered against the county in an action *ex delicto*, brought by express authority of an act of the legislature, which in the case provided for expressly directs that they shall check for such judgment. To this act more particular reference will be hereafter made.

3. The commissioners are in terms forbidden to check for any claims unless they are legal and valid county claims, and there is money in the treasury for the express purpose of paying such claims. And the treasurer is forbidden, under the penalties of misdemeanor, from paying any claims whatever, unless they are approved, audited, and drawn for by the county commissioners.

These constitutional provisions and regulations of law constitute a system as to county claims, in which all questions fall within the jurisdiction of the commissioners, subject only to correction by the right of appeal given. If one holding a county claim may, without filing it in the office prescribed or obtaining "audit," or after audit, upon refusal to pay, go at his pleasure into the Court of Common Pleas and sue the county to judgment, it seems to us that it would tend to derange the system, to produce confusion, and to entail upon the county unnecessary expenses and delays.

But it is said that, by an act of 1868, the counties were made bodies politic and corporate, and may now "sue and be sued." That is true, but we do not see that a subsequent act of the legis-

lature should control the construction of the constitution previously adopted. Besides, the simple fact that counties may now "be sued" determines nothing as to the court or the manner in which it may be done. There is no requirement that it can only be done in the Court of Common Pleas; and we think that, when the holder of a county claim files it for "audit" in the office of the commissioners, he may be said in effect to sue the county, not in the Court of Common Pleas, but in the tribunal specially provided to hear and determine such claims. The legislature has, however, made special provision that certain actions of a particular character—actions *ex delicto* for damages on account of defective "repairs on highways," the destruction of houses by mobs, &c.—may be brought directly against the county in the Court of Common Pleas. See *Gen. Stat.*, §§ 1087, 2571, and 2572.

It seems to us that this special permission as to particular actions authorizes the inference that such permission was necessary, and that no such right exists beyond the special cases thus provided for. *Expressio unius est exclusio alterius.* This view is aided by the terms of those special acts, "may recover in an action against the county the amount of damage fixed by the finding of a jury,   *   *   may claim and prosecute the county in which the offence shall be committed for any damage he shall sustain thereby; and the said county shall be responsible for the payment of such damages as the court may award, which shall be paid by the county treasurer of such county on a warrant drawn by the county commissioners thereof, which warrant shall be drawn by the county commissioners as soon as a certified copy of the judgment roll is delivered to them for file in their office." No such special direction as to the manner of payment exists as to any other judgment against the county, and the fair inference is that none such were expected or intended to be rendered. The State cannot be sued, nor can the county as a part of the State, without permission given. *Young* v. *City of Charleston*, 20 *S. C.*, 116.

It is, however, further said, that the Court of Common Pleas is a court of general jurisdiction, and as such has jurisdiction of all matters not given exclusively to an inferior tribunal or expressly forbidden to that court. The principle contended for may

be correct, but, as we think, does not apply to this case. Jurisdiction is expressly given to the board of county commissioners, but not to the Court of Common Pleas, without, however, any express negation. Under some circumstances, this might give the Court of Common Pleas concurrent jurisdiction; but in this case we think it does not. First, the same instrument (constitution) defines the powers and duties of both, giving original jurisdiction to the board of county commissioners, with only the right of appeal to the Court of Common Pleas; and, second, the board of county commissioners was created by the constitution as a new body, with certain local powers and for certain special purposes, and in such case the powers given and the mode and manner of their exercise are in their nature exclusive. "It is the general rule, that if an affirmative statute, which is introductive of a new law, direct a thing to be done in a particular manner, that thing shall not, even although there are no negative words, be done in any other manner." *Sternberger* v. *McSween*, 14 *S. C.*, 35; *Kennedy* v. *Reames*, 15 *Id.*, 552; *Ex parte Lewie*, 17 *Id.*, 154. In this latter case, the Chief Justice said: "The Court of Common Pleas is the general fountain of justice, and when the rights of a citizen, either derived from the common law or the statutes, are invaded and the power to protect is conferred upon no special jurisdiction, he may seek redress in that court. But where rights are created by statute, to be obtained and protected in a special manner specified in the act and by a special tribunal, no other court can assume jurisdiction. On the contrary, parties interested must pursue the course prescribed, and must seek the aid of the tribunal upon which the power to grant or protect has been conferred, &c. *Howze* v. *Howze*, 2 *S. C.*, 232," &c.

It may assist us in testing the right claimed to bring an original action in the Court of Common Pleas upon an ordinary *ex contractu* county claim to inquire how a judgment rendered in such a case could be collected. Certainly the execution could not be levied on the private property of the citizens of the county, nor could it be levied upon the public funds or property of the county. See *Gen. Stat.*, §§ 617, 440. "All county poor farms, poor houses, and hospitals, court houses, jails, and all other public property of every kind or description, actually used as such, are

forever exempt from attachment, levy, and sale, on account of any judgment, lien, or claim whatsoever against the county to which they or any of them belong," &c.   The judgment creditors in this case could not claim the benefit of the express statutory provision made for the payment of judgments recovered in the special cases of tort hereinbefore referred to.   It would, therefore, be necessary for them to go back to the county commissioners to obtain a warrant on the county treasurer for the payment of the judgment, as the said treasurer is positively forbidden, under penalties, to pay any kind of county claim, whether in judgment or not, except upon the warrant of the county commissioners.   In case such warrant was refused, they might, as suggested in the argument, apply for a writ of mandamus to test the question, whether the board of county commisssioners, having already audited their claim, are not bound to issue a warrant for its payment, and that right they had as clearly as now before they commenced this action in the Court of Common Pleas.   *Moses Mand.*, 104; *Boyce* v. *Supervisors of Cayuga County*, 20 *Barb.*, 294; *People* v. *Supervisors of Chenango*, 4 *Seld.*, 318; *State ex rel. Marshall* v. *Starling*, 13 *S. C.*, 266; and *In re Conant's Claims*, 21 *Id.*, 364.

It seems to us that an original action in the Court of Common Pleas upon an ordinary county claim is not only unauthorized by the system provided for the settlement of county claims, but can be productive of no advantage whatever.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and that the complaint be dismissed for want of jurisdiction, without prejudice to the plaintiffs to enforce their claim by other proper proceedings, as they may be advised.